NILE LEATHAM, ESQ.
Nevada Bar No. 002838
AMANDA K. BAKER
Nevada Bar No. 015172
**KOLESAR & LEATHAM**
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Telephone: (702) 362-7800
Facsimile: (702) 362-9472
E-Mail: nleatham@klnevada.com
         abaker@klnevada.com

TODD A. BURGESS, Esq. (*Pro Hac Vice Pending*)
Arizona Bar No. 019013
**POLSINELLI PC**
One E. Washington St., Ste. 1200
Phoenix, Arizona 85004
Telephone: (602) 650-2000
E-Mail: taburgess@polsinelli.com

*Attorneys for Plaintiff*
*Continue Media, LLC*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE: | Case No. BK-S-19-17165-ABL |
| SCHRAMM, JAMES PAUL,<br>SCHRAMM, RENELYN GUILLERMO, | Chapter 7 |
| Debtor(s). | |
| CONTINUE MEDIA, LLC, Wyoming limited liability company, | Adv. No: |
| Plaintiff, | **VERIFIED COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT** |
| vs. | |
| JAMES PAUL SCHRAMM and RENELYN GUILLERMO SCHRAMM, | |
| Defendants. | |

Plaintiff, CONTINUE MEDIA, LLC ("CM" or "Plaintiff"), by and through undersigned counsel, as and for its complaint against defendants JAMES PAUL SCHRAMM ("Schramm") and RENELYN GUILLERMO SCHRAMM ("R.G. Schramm" and together with Schramm, the "Debtors" or "Defendants"), alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. On November 5, 2019, the Debtors filed a voluntary petition under chapter 7 commencing the above-captioned case.

2. The Debtors are husband and wife residing in the State of Nevada.

3. All acts, representations and omissions by J.P. Schramm alleged herein were undertaken by J.P. Schramm on behalf of, and for the benefit of, the marital community consisting of J.P. Schramm and R.G. Schramm. R.G. Schramm is named as a defendant herein for purpose of binding the marital community and community property of the Debtors.

4. Plaintiff CM is a Wyoming limited liability company and an unsecured creditor of the Debtors.

5. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

6. Venue of this proceeding is proper in this District pursuant to 28 U.S.C. § 1409.

7. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

8. The deadline to file a complaint to determine dischargeability of debts in this bankruptcy case is February 10, 2020. Therefore, Plaintiff's complaint is timely filed.

9. Pursuant to Local Rule 7008, Plaintiff does consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**GENERAL ALLEGATIONS**

10. CM is a marketing company that assists its clients in developing their business and optimizing their direct-to-consumer marketing. Ryan Dall ("Dall") is a principal of CM.

11. In late 2017, CM was interested in purchasing television airtime for 30 minute infomercials.

12. Dall, on behalf of CM, consulted with a member of Metal International, a self-described "Los Angeles based group of entrepreneur leaders who work in Media, Entertainment,

1  Technology, Arts, Commerce, Healthcare and Creative worlds." *See*
2  https://www.metal.international/.

3      13.    In December, 2017, the founder of METAL International referred Dall to television
4  and movie actor Billy Zane ("Zane").[1]

5      14.    On December 20, 2017, Zane referred CM to Schramm, whom Zane described to
6  Dall as a major player in purchasing bulk/high volume short form media from major television
7  networks such as NBC Universal and Scripps (now the Discovery Network).

8      15.    Schramm's IMDB website bio states, *inter alia*, "James Schramm is a businessman
9  and a visionary facilitating strategic partnerships in the entertainment, motion picture and media
10  sector. Currently, his relationships and strategic partnerships occupy over 70% of Upfront media
11  buying and 20% of distribution services in Hollywood." *See*
12  https://www.imdb.com/name/nm1682990/bio?ref_=nm_ov_bio_sm.

13      16.    At the time, the introduction by Zane and the content of the IMDB biography lent
14  some level of credibility to Schramm that facilitated Schramm's efforts to defraud CM.

15      17.    Beginning in late December, 2018 and continuing through the date of this
16  Complaint, Schramm knowingly and intentionally conceived, implemented and perpetuated a
17  scheme to defraud CM of more than one million dollars.

18      18.    Schramm represented to CM, through Dall, that he managed multi-million-dollar
19  media plans for "investors."

20      19.    Schramm represented to CM, through Dall, that if he could pre-pay television
21  networks for media time in bulk, television networks would give Schramm three (3) free airings
22  or "media credits" for every airing purchased in advance. Schramm represented that his business
23  model focused on 30 second television commercials used by movie studios for promoting trailers
24  for new movie releases.

25      20.    Schramm represented to CM, through Dall, that for every spot paid for in advance
26  the networks promised to give Schramm 3 to 5 free "bonus airings" or credits at the networks that

---

[1] Zane played antagonist Caledon Hockley in the epic romantic disaster film Titanic released in 1997.

3326119 (10969-1)                                          - 3 -

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  Schramm could then use to get a bigger frequency for his clients, thus getting more commercials
2  aired in exchange for paying for airings in bulk in advance.

3      21.    CM was interested in 30 minute infomercial time, not 30 second commercials, but
4  Schramm represented to Dall that he could apply the same model to 30 minute infomercials.
5  Schramm represented to Dall that, if CM paid in advance for bulk airings, Schramm could provide
6  discounted media to CM and its clients plus additional free airings in the form of "media credits."

7      22.    In reliance on Schramm's representations, CM provided Schramm with media
8  schedules detailing the dates and times for weekly and monthly airings that CM wanted to purchase
9  for its clients. Schramm in turn provided CM with pre-negotiated rates for the media schedules
10 that Schramm represented came from the networks.

11     23.    Schramm represented to CM, through Dall, that all media being purchased were
12 guaranteed to air, meaning that all time slots on the media schedule were not pre-emptible.

13     24.    Schramm represented to CM, through Dall, that all in-bulk advance purchases of
14 "media credits" were fully refundable, meaning that if the credits were not used, CM could simply
15 request and receive a refund from the networks.

16     25.    Schramm represented to CM, through Dall, that all monies received by Schramm
17 from CM would be paid by Schramm to the "networks" to purchase media in bulk for the benefit
18 of CM.

19     26.    In reliance on all of Schramm's prior representations, on January 1, 2018, CM
20 wired $140,000 to an account at U.S. Bank designated by Schramm with the understanding that
21 the funds would be used by Schramm to pre-pay the networks for media time to air CM's client's
22 infomercials during the month of February 2018 based on a media schedule designated by CM and
23 pre-negotiated rates matched to the schedule by Schramm.

24     27.    During the month of February, 2018, CM timely provided all media to Schramm,
25 which Schramm represented would be provided to the networks for airing in accordance with the
26 media schedule. By the end of February, 2018, none of the CM media had aired.

27     28.    Dall, on behalf of CM, remained in constant contact with Schramm during
28 February, 2018, and thereafter regarding the media schedule and the lack of airings.

KOLESAR & LEATHAM
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

29. With great conviction, Schramm gave very persuasive excuses of the lack of airings during February 2018. Schramm represented to CM, through Dall, that CM had $140,000 of "media credits" with the networks based on the January 1, 2018 wire. And, Schramm convinced CM to again pre-pay in bulk for additional airings for March 2018.

30. Schramm represented to CM, through Dall, on many occasions that in order to take advantage of the discounted media prices plus additional free bonus media credits, the networks had to receive all of the money for the bulk purchase before the first day of the month.

31. In reliance on all of Schramm's prior representations, on February 22, 2018, CM wired an additional $162,795 to an account at U.S. Bank designated by Schramm with the understanding that the funds would be used by Schramm to pre-pay the networks in bulk for media time to air CM's client's infomercials during the month of March 2018 based on a media schedule designated by CM and pre-negotiated rates matched to the schedule by Schramm.

32. During the month of March, 2018, CM again timely provided all media to Schramm, which Schramm represented would be provided to the networks for airing in accordance with the March, 2018 media schedule. During the month of March, 2018 only $83,776 worth of media time or roughly half of the agreed-upon media schedule aired.

33. On information and belief, Schramm purchased just enough media for CM during March, 2018, to bait CM into continuing to wire additional funds to Schramm.

34. Dall continued to stay in constant contact with Schramm during March, 2018, and thereafter regarding the media schedule and the lack of airings.

35. With great conviction, Schramm continued to give what Dall perceived to be very persuasive excuses for the lack of airings during March, 2018. Schramm represented to CM, through Dall, that at the end of CM still had $219,019 of "media credits" with the networks based on the media that failed to air during January and February, 2018.

36. Schramm also represented to CM that these "media credits" were extremely valuable because they would generate 3 to 5 times the amount of the credit by way of additional free bonus media credits that CM could then sell to its customers.

37. After Schramm failed to deliver on the March, 2018 media schedule, he was able to convince CM to continue to do business with him, but CM wanted something in writing from Schramm.

38. Schramm presented CM with a "Media Agreement," dated April 6, 2018 to document the parties' dealings. A true and correct copy of the April 6, 2018 Media Agreement (the "4/6/2018 Agreement") is attached hereto as **Exhibit A** and is incorporated herein by reference.

39. In reliance on the 4/6/2018 Agreement and Schramm's prior representations, CM sent two additional wires to an account designated by Schramm for media schedules for April and May, 2018.

40. On April 2, 2018, CM wired $114,759 to Schramm for an April, 2018 media schedule; and on April 6, 2018, CM wired an additional $353,680 for the May, 2018 media schedule.

41. Among other things, the 4/6/2018 Agreement confirmed the amounts that CM had paid Schramm to date, and CM's expected media spend through the end of June, 2018.

42. As of April 6, 2018, CM had wired a total of $771,234 to Schramm, and CM wired an additional $271,096 to Schramm for the projected June, 2018 media schedule.

43. By the end of May, 2018, CM had paid Schramm a total of $1,042,330 but only $182,909 worth of media had actually aired.

44. On or about June 1st 2018, Schramm pitched/convinced Dall that, because CM's infomercials were not airing as expected, CM should take part of the existing pre-paid media credits accumulated to that point, which netted out to $859,421, and "invest" $250,000 towards purchasing a media schedule that could be used to sell media time to third-parties, which with the "free bonus airings" from the networks, would generate returns of 3 to 4 times the amount being invested.

45. According to Schramm, using $250,000 of media credits for this investment would leave CM with a balance of $609,367 in infomercial media credits at the networks in addition to producing a return on investment for CM in the range of $850,000 - $1,180,000.

46. Schramm persuaded CM to execute two interrelated agreements to further his fraudulent scheme, both dated June 1, 2018: (a) a "Media Program Agreement," dated June 1, 2018 with a stated "Media Cost" of $250,000 (the "$250k Agreement"); and (b) a "Media Program Agreement," dated June 1, 2018 with a stated "Media Cost" of $189,000 (the "$189k Agreement"). True and correct copies of the $250k Agreement and $189k Agreement are attached hereto as **Exhibits B and C**, respectively, and are incorporated herein by this reference.

47. Through the $250k Agreement, Schramm represented to CM that he would take $250,000 worth of CM's "media credits" and apply them to purchase in CM's name two media schedules that would be sold to third-parties and generate a minimum return of $850,000 and maybe as much as $1,180,000 with payments to CM beginning the week of June 9, 2018 and the full return of the investments and all profits on or before the August 31, 2018 "Delivery Deadline".

48. However, the $250k Agreement also contemplated CM purchasing an additional $789,000 worth of media under the terms of the $189k Agreement, which would be funded in part from CM's profits from the $250k Agreement and in part through an additional wire from CM to Schramm in the amount of $189,000.

49. Through the $189k Agreement, Schramm represented to CM that this second "investment" would generate a minimum return of $1,420,000 and a maximum return of $2,367,000 on or before September 25, 2018.

50. Under the terms of the $189k Agreement, Schramm agreed to "front" CM $600,000 worth of media until CM received its returns under the $250k Agreement, as long as CM immediately wired Schramm the additional payment of $189,000.

51. In reliance on Schramm's representations, on June 1, 2018 CM wired an additional $189,000 to an account designated by Schramm.

52. By mid-June, with no media airing and none of the promised payments coming back from Schramm, CM began demanding a full refund of all amounts that it had wired to Schramm for the network media credits and the subsequent "investment" media schedules.

53. Over the next several months, Schramm perpetuated the fraud and sought to placate CM with a series of additional misrepresentations and excuses while failing to return a single dollar to CM.

54. Schramm claimed, *inter alia*, that he was simply waiting for the "networks" to refund the money to him.

55. Schramm claimed, *inter alia*, that he received checks from the "networks" for CM, but that the checks were in the wrong amounts.

56. Schramm later began claiming that he had to sell the "media credits" to a third-party, and that he would use the money from the third-party to pay back CM.

57. On information and belief, all or substantially all of the representations described in this Complaint that Schramm made to CM and Dall were intentionally and knowingly false; and were made to perpetuate a fraudulent Ponzi-like scheme on CM and maybe others.

58. On or about October 1, 2018, in an effort to forestall any legal action by CM, Schramm executed a Promissory Note in the principal amount of $609,000 for the "media credits" Schramm claimed CM had with the networks. A true and correct copy of the Promissory Note is attached hereto as **Exhibit D** and is incorporated herein by this reference.

59. Schramm never made any payments on the Promissory Note, despite repeated demands, and never returned any of the $1,231,330 that CM entrusted to Schramm for the purchase of media time.

## FIRST CLAIM FOR RELIEF: 11 U.S.C. § 523(a)(2)(A)

60. Plaintiff incorporates all allegations stated in paragraphs 1 – 59 above, as if fully restated herein.

61. As described herein, Schramm made affirmative misrepresentations, fraudulent omissions, and engaged in deceptive conduct throughout the course of its dealings with CM.

62. At all relevant times, Schramm had full knowledge of the falsity and deceptiveness of his statements and conduct.

63. At all relevant times, Schramm acted with actual intent to deceive CM.

64. Plaintiff is entitled to recover punitive damages pursuant to NRS § 42.005.

65. CM justifiably relied on Schramm's statements and conducts to its extreme detriment, which proximately caused damage to CM in the amount of at least $1,048,421 or such greater amount as may be proven at trial.

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment in its favor and against the Defendants for compensatory damages and punitive damages, all in an amount to be determined at trial, including costs of suit, along with a finding that the judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## **SECOND CLAIM FOR RELIEF:  11 U.S.C. § 523(a)(4)**

66. Plaintiff incorporates all allegations stated in paragraphs 1-65 above as if fully set forth herein.

67. Schramm's conduct as alleged herein constitutes a felonious taking of CM's personal property with actual intent to convert such property and deprive CM of same.

68. At all relevant times, Schramm acted with an evil heart or purpose, and/or maliciously without excuse or color of right, and proximately caused damage to CM.

69. Plaintiff is entitled to recover punitive damages pursuant to NRS § 42.005.

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment in its favor and against the Defendants for compensatory damages and punitive damages, all in an amount to be determined at trial, including costs of suit, along with a finding that the judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## **THIRD CLAIM FOR RELIEF:  11 U.S.C. § 523(a)(6)**

70. Plaintiff incorporates all allegations stated in paragraphs 1-69 above as if fully set forth herein.

71. Schramm's conduct as alleged herein was undertaken intentionally, willfully and maliciously and proximately caused damage to CM.

72. Plaintiff is entitled to recover punitive damages pursuant to NRS § 42.005.

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment in its favor and against the Defendants for compensatory damages and punitive damages, all in an amount to

be determined at trial, including costs of suit, along with a finding that the judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

### FOURTH CLAIM FOR RELIEF: BREACH OF CONTRACT

73. Plaintiff incorporates all allegations stated in paragraphs 1 – 72 above, as if fully set forth herein.

74. The Promissory Note evidences a debt due and owing from Schramm to CM.

75. Schramm failed and refused to pay all amounts due and owing under the Promissory Note despite repeated demand by CM.

76. Schramm's breach of the Promissory Note caused damage to CM in an amount to be proven at trial.

77. Under the terms of the Promissory Note, CM is entitled to collect all collection costs, including attorneys' fees and costs.

78. Based on the allegations stated above, all amounts due and owing under the Promissory Note are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2(A), 52(a)(4), and/or 523(a)(6).

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment in its favor and against the Defendants for all amounts due under the Promissory Note, together with pre-judgment and post-judgment interest at the default rate of 18% per annum, attorneys' fees, and costs, all in an amount to be determined at trial, along with a finding that the judgment is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2(A), 52(a)(4), and/or 523(a)(6).

### FIFTH CLAIM FOR RELIEF:
### ALTER EGO LIABILITY / PIERCING THE CORPORATE VEIL

79. Plaintiff incorporates all allegations stated in paragraphs 1 – 78 above, as if fully set forth herein.

80. On information and belief, at all relevant times, Schramm acted in his in individual capacity for his own personal benefit and for the benefit of his marital community.

81. The 4/6/2018 Agreement, $250k Agreement, and the $189k Agreement all were executed by Schramm doing business as "Bosch/XLI41".

3326119 (10969-1)                                     - 10 -

82.     On information and belief there is no entity incorporated in the State of Nevada or elsewhere titled "Bosch/XLI41".

83.     On information and belief, over the past several years, Schramm has formed a number of single member Nevada limited liability companies or corporations, including, but not necessarily limited to XLI41, LLC (formed 7/10/2017), XLI Technologies Inc. (formed 8/22/2012, but now revoked), XLI Studios, LLC (formed 10/2/2019), United Artist Studios, LLC (formed 5/22/2018), United Artist Film Festival LLC (formed 5/30/2018, now in default), Moapa Valley (domestic corporation formed 5/13/2019, formation on administrative hold), Lucas James Studio LLC (formed 6/1/2018), Logandale (domestic corporation formed 5/9/2019), JP Schramm LLC (formed 2/28/2013, now revoked), Bosch Technologies LLC (formed 11/20/2015), Bosch Media L.L.C. (formed 7/9/2013, now revoked), and Bosch International LLC (formed 5/7/2015, now revoked).

84.     To the extent that Schramm claims to have been acting by, for, or through any Nevada entity, on information and belief any such entity is the alter-ego of Schramm and the facts are such that adherence to the fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice.

85.     On information and belief, all of the entities formed by Schramm are influenced and governed solely by Schramm.

86.     On information and belief, there is such a unity of interest and ownership between Schramm and his entities that he is inseparable from all such entities.

87.     On information and belief, Schramm has exercised complete dominance and control over the entities such that the entities are a mere shell and instrumentality for conducting Schramm's personal business.

88.     On information and belief, Schramm co-mingled assets and funds between and among him and the entities; the entities are undercapitalized; Schramm treated the any assets of the entities as his own; and Schramm failed to observe corporate formalities.

WHEREFORE, to the extent that Schramm claims to have been acting on behalf of one or more entities, Plaintiff respectfully requests that the Court pierce the corporate veil and enter a

nondischargeable judgment in favor of Plaintiff and against Defendants for all amounts sought in this Complaint, in an amount to be determined at trial, including costs of suit, along with a finding that the judgment is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and/or 523(a)(6).

DATED this 10th day of February 2020.

**KOLESAR & LEATHAM**

By: */s/ Amanda K. Baker, Esq.*
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
AMANDA K. BAKER
Nevada Bar No. 015172
400 S. Rampart Blvd., Ste. 400
Las Vegas, Nevada 89145

-and-

TODD A. BURGESS, Esq. (*Pro Hac Vice Pending*)
Arizona Bar No. 019013
**POLSINELLI PC**
One E. Washington St., Ste. 1200
Phoenix, Arizona 85004

*Attorneys for Plaintiff
Continue Media, LLC*

3326119 (10969-1)                - 12 -

## VERIFICATION

RYAN DALL, under penalty of perjury under the laws of the United States of America, declares as follows:

1. I am the managing member of Continue Media, LLC, and I am authorized to submit this verification on its behalf.

2. I have read the foregoing Verified Complaint to Determine Dischargeability of Debt (the "Complaint").

3. I have personal knowledge regarding all events described in the Complaint.

4. The facts alleged in the Complaint are true and correct to the best of my knowledge, information and belief.

5. If called to testify in this matter, I can and will testify competently to the facts alleged in the Complaint.

DATED: February 10, 2020.

_____
Ryan Dall
Managing Member
CONTINUE MEDIA, LLC

72260214.3